# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| Case No. | CR 18-172-GW | Date | October 20, 2023 |
|---|---|---|---|

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|
| Interpreter | NONE |

| Javier Gonzalez | None Present | Jason C. Pang - not present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 10. Kelly Deshannon | not | ✔ | | 10. Bernard J. Rosen, CJA | not | ✔ | |

**PROCEEDINGS:**  **IN CHAMBERS- TENTATIVE RULING ON DEFENDANT DESHANNON'S MOTION FOR JUDGMENT OF ACQUITTAL ON ALL COUNTS FOR INSUFFICIENT EVIDENCE OR, IN THE ALTERNATIVE, FOR DISMISSAL OF THE INDICTMENT OR A NEW TRIAL ON ALL COUNTS ON THE GROUND OF PROSECUTORIAL MISCONDUCT [1081]**

Attached hereto is the Court's Tentative Ruling on Defendant's Motion [1081] set for hearing on October 23, 2023 at 8:00 a.m.

Initials of Deputy Clerk    JG

<u>**USA v. Kelly Deshannon**</u>; Case No. 2:18-cr-00172-GW-10
Tentative Ruling on Motion for Judgment of Acquittal on All Counts for Insufficient Evidence or, in the Alternative, for Dismissal of the Indictment or a New Trial on All Counts on the Ground of Prosecutorial Misconduct

## I.  Background

On October 14, 2021, Defendant Kelly Deshannon ("Defendant" or "Deshannon") was indicted for five offenses:  Count 1 – racketeering conspiracy; Count 2 – violent crime in aid of racketeering; Count 3 – conspiracy to commit violent crime in aid of racketeering; Count 9 – attempted carjacking; and Count 12 – brandishing, using, or carrying a firearm during and in relation to, or possessing a firearm in furtherance of, a crime of violence.  *See generally* First Superseding Indictment, Docket No. 691.  Defendant proceeded to trial on February 28, 2023.  On March 13, 2023, the jury acquitted Defendant on Count 9, but hung on the remaining four counts. Docket No. 963.  Upon application of the Government, the Court dismissed Count 3 on June 28, 2023.  Docket No. 1003.

On July 18, 2023, the Government began its retrial of Defendant as to the remaining three counts.  On July 24, 2023, the jury convicted Defendant of all three remaining counts:  Count 1 – conspiracy to participate in a racketeering enterprise; Count 2 – aiding and abetting a crime of violence in aid of racketeering; and Count 12 – aiding and abetting carrying a firearm by brandishing it during a crime of violence.  Docket No. 1037.

Now before the Court is Defendant's motion for judgment of acquittal or, in the alternative, either a new trial or dismissal of the indictment.  *See* Motion of Defendant Deshannon for Judgment of Acquittal on All Counts for Insufficient Evidence or, in the Alternative, for Dismissal of the Indictment or a New Trial on All Counts on the Ground of Prosecutorial Misconduct ("Mot."), Docket No. 1081.  The Government filed an opposition, *see* Opposition to Defendant Kelly Deshannon's Post-Trial Motions ("Opp."), Docket No. 1088, and Defendant filed a reply in support, *see* Reply of Defendant Deshannon to the Government's Opposition to her Motion ("Reply"), Docket No. 1089.

## II.  Legal Standard

A.  <u>Motion for a Judgment of Acquittal</u>

Under Fed. R. Crim. P. 29, a defendant may move for a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction.  2A Wright & Miller, *Federal*

*Practice and Procedure: Criminal* § 466 (4th ed. 2023 update) ("*Wright & Miller*").  When evaluating a sufficiency-of-the-evidence challenge, a reviewing court "makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a meaningful opportunity to defend against the charge against him and a jury finding of guilt beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (internal quotation marks omitted). "[A] challenge to the sufficiency of the evidence to support a criminal conviction requires [a reviewing court] to determine whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Begay*, 673 F.3d 1038, 1043 (9th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  As part of this two-step inquiry, "[f]irst, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010).  In doing so, a court "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial," but "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*

Second, "after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and alteration omitted).  More than a mere modicum of evidence is required to support a verdict, and this second step protects against the rare occasion when a properly instructed jury may convict even when no rational trier of fact could find guilt beyond a reasonable doubt. *See id.*  However, at this second step, a reviewing court may not insert its own beliefs as to whether the evidence at trial established guilt beyond a reasonable doubt, only whether any rational trier of fact could make such a finding.  *See id.*  Reversing a verdict requires "the evidence of innocence, or lack of evidence of guilt, is such that *all rational fact finders* would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." *Id.* at 1165 (emphasis added).

B. <u>Motion for a New Trial</u>

Under Fed. R. Crim. P. 33, upon a defendant's motion, a court "may vacate any judgment and grant a new trial if the interest of justice so requires."  While a motion for a new trial may be

based on an insufficiency of the evidence akin to a motion for acquittal under Fed. R. Cim. P. 29,[1] Rule 33 allows for a larger range of reasons to set aside a jury verdict and to grant a new trial.  For example, a new trial may be granted on the basis of newly discovered evidence, *see* Fed. R. Crim. P. 33(b)(1), or on the ground of misconduct by the Government or the trial judge.  *See, e.g., United States v. Andrade*, 993 F.Supp.2d 1269, 1280 (D. Nev. 2014).

Government misconduct that results in the government's failing to fulfill its responsibilities fairly, consistent with due process, and that failure is prejudicial to the defendant, may require a new trial.  *See United States v. Blueford*, 312 F.3d 962, 976 (9th Cir. 2002).  To justify a new trial, prosecutorial misconduct must: (1) be flagrant and (2) cause substantial prejudice to the defendant. *See United States v. Ross*, 372 F.3d 1097, 1109 (9th Cir. 2004) (relating to outrageous government conduct); *see also United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991) (relating to investigation and prosecution).  Flagrant misbehavior does not include accidental or merely negligent governmental conduct, but may embrace reckless disregard for constitutional obligations. *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008).

## III.  Discussion

Defendant moves for a judgment of acquittal on all counts claiming there was insufficient evidence to convict.  Defendant argues that all three counts require proof that Deshannon acted in furtherance, or for the benefit, of a RICO enterprise, *i.e.*, the Michael Lerma Cell of the Mexican Mafia ("Lerma Cell").[2]  *See* Mot. at 4.  Defendant claims that the evidence cannot prove

---

[1] As observed in 3 *Wright & Miller* § 591:

> A motion for a new trial on the ground that the verdict is against the weight of the evidence must be distinguished from a motion for judgment of acquittal under Rule 29.  The two motions may be combined, but they are governed by different standards.  On a motion for judgment of acquittal, the court is required to approach the evidence from a standpoint most favorable to the government and to assume the truth of the evidence offered by the prosecution.  If on this basis there is substantial evidence justifying an inference of guilt, the motion for acquittal must be denied.

In regards to an evidentiary evaluation, a district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal.  As observed in *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992):

> The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.  If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

[2] Racketeering is an established element for both Count 1 and Count 2.  Defendant asserts that racketeering is also a

Deshannon knowingly agreed to facilitate a scheme which includes the operation or management of a RICO enterprise, and thus acquittal is required. *See id*. at 5. The Government responds that both direct and circumstantial evidence clearly establish Defendant knowingly agreed to facilitate a scheme, including the operation or management of the Lerma Cell. *See* Opp. at 1.

In the alternative, Defendant contends that the indictment should be dismissed, or a new trial granted, on the basis of prosecutorial misconduct. *See* Mot. at 11. The Government argues Defendant's claims of prosecutorial misconduct are factually and legally baseless. *See* Opp. at 1. The Court will address both claims by Defendant in turn.

A. <u>Insufficient Evidence</u>

Defendant initially challenges her conviction on the basis that, pursuant to Fed. R. Crim. P. 29, there is no evidence from which a jury could find Deshannon knowingly agreed to facilitate a scheme which included the operation or management of the Lerma Cell enterprise. *See* Mot. at 5. The Government claims there was sufficient evidence, both direct and circumstantial, to clearly establish Deshannon's knowing agreement to facilitate a scheme, including the operation or management of the Lerma Cell. *See* Opp. at 6-7.

It is unlawful for any person to be "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Further, conspiracy to commit such racketeering is also illegal. *See* 18 U.S.C. § 1962(d). "[A] defendant is guilty of conspiracy to violate § 1962(c) if the evidence showed that she knowingly agreed to facilitate a scheme which includes the operation or management of a RICO enterprise." [3] *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004) (internal quotation marks and alteration omitted).

Viewing the evidence in the light most favorable to the prosecution, the Court would agree with the Government that there was sufficient evidence for any rational trier of fact to have found that Defendant knowingly agreed to facilitate a scheme which included the operation or

_____

required element for Count 12 as its underlying violent crime is Count 2.

[3] The Government questions the appropriate *mens rea* standard to be applied to a RICO conspiracy charge under U.S.C. § 1962(d), claiming that a defendant need only be aware of the essential nature and scope of the enterprise and intend to participate in it. *See* Opp. at 6. Given the Government ultimately acquiesces to proceed under Defendant's preferred *mens rea* standard, the Court will apply that stricter standard here. *See id*.

management of the Lerma Cell.  The Government offers a host of examples of both direct and circumstantial evidence showing Defendant's knowledge.

With regard to direct evidence, the Government points to numerous times when Seferino Gonzalez directly informed Defendant about his management role in the Lerma Cell as the shot caller of the City of Pomona.  When presenting this evidence at trial, the Government also relied on expert witness Deputy Devon Self to interpret and give context to the, at times, coded language used by Gonzalez. *See* Opp. at 7-8.  In Exhibit 216, Gonzalez tells Defendant that if anyone from a rival gang "12th Street" tries to interfere with Deshannon's collection of money from a customer Gloria, to tell them "my man has the keys to this city."  Deputy Self explained that the phrase "keys to the city" referred to Gonzalez's role as a Mexican Mafia shot caller for Pomona. *See* Opp. at 7-8. As shot caller, Deputy Self explained that Gonzalez would be in a position of authority to control the city on behalf of the Mexican Mafia. *See id.*  Viewing this evidence in the light most favorable to the prosecution, it is reasonable to infer that Defendant understood that it is only through Gonzalez's shot caller position with the Lerma Cell, and Defendant's connection to Gonzalez, that Defendant would be able to collect money from Gloria and make a rival gang submit.

In Exhibit 228, Gonzalez tells Defendant "[y]ou're me right now dude and that's what I need you to do.  That's what I need you to be."  Defendant responds that it's more difficult for her because she's a white female that isn't strapped, so it's "not as easy to push, for [Deshannon]." Gonzalez affirms her by saying, "You know I don't give a fuck if you're a girl …. If you're a girl or not, you have the same amount of power dude."  Deputy Self explained that Gonzalez was telling and instructing Defendant to use his position and power as the Lerma Cell's shot caller to conduct his business on behalf of the Lerma Cell. *See* Opp. at 8.  Viewing this evidence in the light most favorable to the prosecution, it is reasonable to infer that Defendant understood Gonzalez was telling her that she, despite being a white, unarmed female, could push others because she was his alter ego on the outside.

Gonzalez makes further references to Defendant regarding the benefits that she receives by nature of his status, and her working with him.  In Exhibit 221, Defendant voices concerns over what Gonzalez's brother, another gang member, is capable of.  Gonzalez reassures Defendant that "he's not capable of doing something that's fucking gonna effect me or that's gonna go against my word," and that "[n]one of the brothers would do that."  Deputy Self explained that Gonzalez's

words were a reflection of his position of authority as shot caller in the Mexican Mafia where lower level soldiers must obey him, and by connection Defendant.  *See* Opp. at 9.  The inference most favorable to the prosecution supports this explanation.   Additionally, in Exhibit 258, Gonzalez and Defendant are discussing prices for drug purchases from a supplier and Gonzalez tells her "they only chose me because it's my city … that's the only reason they chose me because they didn't want to pay taxes, they didn't want Cheryl to come take the shit."  Deputy Self explained that based on this call, Defendant is getting a discounted price on drugs from a supplier because of Gonzalez's role as shot caller in the Lerma Cell.  *See* Opp. at 8-9.  By working with Gonzalez and giving Defendant a discount, the suppliers can avoid paying taxes to the Lerma Cell or having Cheryl Castaneda, as senora of the Lerma Cell, take all of their drugs entirely.  *See* (7/20/23 RT 573:16-574:18).  Viewing this evidence in the light most favorable to the prosecution, the jury could infer that Defendant understood she was benefiting by receiving a discount in drug prices because of Gonzalez's high ranking position in the Lerma Cell.  Similarly, Defendant understands Gonzalez's explanation that by working with him, as part of the Lerma Cell, they can avoid paying tax to the Lerma Cell or having the Lerma Cell senora take all of their drugs.

In addition to the above direct evidence, the Government presents a wide range of circumstantial evidence establishing Defendant knowingly agreed to the facilitate the management and operation of the Lerma Cell.  In *United States v. Fernandez*, the Ninth Circuit found the evidence at trial showing defendant collected protection money, passed messages, smuggled drugs into prison, and accepted payment for drugs sold on the street were enough to justify a RICO conspiracy.  388 F.3d 1199, 1230 (9th Cir. 2004).  The Government demonstrates Defendant's agreement to similar conduct and more.  First, the Government presented evidence that Defendant agreed to help Gonzalez collect money and items, including Bill McCord's Mercedes, as a form of a taxing or acquisition of assets for the Lerma Cell.  *See* Opp. at 10-11.  Second, the Government showed Defendant passed messages from Gonzalez to other members of the Lerma Cell, including the address and other information in attempting to take McCord's property.  *See id.* at 11.  Third, the Defendant agreed to help smuggle drugs into jail.  *See id.*  Fourth, Defendant helped to broker drug deals on the streets on behalf of Gonzalez.  *See id.*  Additionally, Defendant helped Gonzalez by sending him money while he was incarcerated.  *See id.*  In the light most favorable to the prosecution, a rational trier of fact could infer that Defendant had knowledge of the Lerma Cell through all of these actions.

Apart from the specific examples the Government cites to in its motion, the record at trial shows many other instances in which a juror could have determined Defendant had knowledge of the Lerma Cell.  In Exhibit 203, Gonzalez tells Defendant that she shouldn't get intimidated by anyone because "[t]hat city is mine dude, okay?" and "[j]ust because I am here don't mean nothing."   Additionally, in Exhibit 259, Gonzalez asks Deshannon "[h]ow's the business," to which Defendant responds, "It's going pretty good … the only thing is that people … they don't pay."  Gonzalez tells her "[t]hen don't give it to them. Because there's no one else out there baby," and "[m]ake em understand that. You know what I mean."  Defendant answers "[t]hat's true."  In sum, the Government presented both direct and circumstantial evidence that, in the light most favorable to the prosecution, would allow any rational trier of fact to find that Defendant was knowledgeable about the Lerma Cell, including its operation and management.

Defendant's arguments as to the opposite are insufficient.  Defendant points to Exhibit 207 as proof of Deshannon's ignorance to the Lerma Cell because of her apparent struggle to understand the mechanics of a drug deal and how it benefits Gonzalez.  *See* Mot. at 7. While the conversation between Gonzalez and Defendant may raise some questions as to Deshannon's fluency in drug operations, at the end of that same call, Defendant clearly is given knowledge of Gonzalez's role in the Lerma Cell.  Gonzalez explicitly tells Defendant the drug dealer has "gotta to pay me and he's gotta pay Cheryl," and Deshannon needs to be the middleman, to which Deshannon responds "[o]kay, all right."  Next, Defendant points to Exhibit 234 where Deshannon does not seem to understand why Gonzalez would tell her that if he cannot pay Castaneda her money that he might be beat up or stabbed.  *See* Mot. at 7-8.  However, further excerpts of that same call appear to show Defendant's knowledge and agreement to her role in the Lerma Cell. Defendant reassures Gonzalez  that he won't get beat up or stabbed "because I'm gonna take care, you know what I mean?"  Moreover, Gonzalez reminds Defendant that "[e]verybody should kiss your ass dude," and Defendant responds that "[t]hey do for the most. I mean some do."  Defendant also points to Exhibit 224 to show that Deshannon did not understand the coded language of the Lerma Cell in which Gonzalez's reference to his "aunt" meant Castaneda, his senora.  *See* Mot. at 9. However, in that same call, Defendant appears to evidence her knowledge of the coded language repeatedly referencing storing McCord's boat at "grandma's" house, which appears to be a reference to Castaneda's mother (which aligns with Exhibit 230 where Gonzalez tells Castaneda the plan was to park the boat at Castaneda's mother's house).  Further, Defendant's apparent lack

7

of understanding of the term "aunt" and the plan to give it to Castaneda could be in part due to the sound quality of Exhibit 224, which included heavy static on the call, causing Gonzalez to repeatedly ask if Defendant could hear him.  Regardless of whether Defendant did not quickly grasp Gonzalez's plan for the Mercedes, Defendant explicitly acknowledges her understanding by saying, "Okay, so [Castaneda] can give the pink slip and [Castaneda] gets the Mercedes and then we've even?"

Ultimately, Defendant's argument boils down to "[a] careful review of the intercepted telephone calls involving [Deshannon] clearly raises questions about her knowledge and understanding of what her then-boyfriend Seferino Gonzalez was doing, let alone evidencing any understanding on her part of the operation or management of a RICO enterprise."  Mot. at 22 (internal quotation marks omitted).  This Court does not deny that there may be some evidence in the record that supports Defendant's claim and raises questions for the jury as to the extent of Defendant's knowledge and understanding of the Lerma Cell.  However, a possible explanation, as explained by Deputy Self at trial, is that Mexican Mafia secretaries often gain knowledge and experience through "on-the-job training" where the "longer they are the secretary, oftentimes the more detailed knowledge they will have" because "[t]here is no real school for it, but it's just experience." (7/20/2023 RT at 536:13-24).  When viewing the evidence in the light most favorable to the prosecution as required, "a reviewing court must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Nevils*, 598 F.3d at 1164 (internal quotation marks omitted).  Once resolving those questions in the prosecution's favor, it is clear that any rational trier of fact may find that Deshannon had the requisite knowledge to be convicted on all three counts.  Thus, the Court would **DENY** the motion for judgment of acquittal on all counts.

Similarly, while it has been noted that, for purposes of Fed. R. Crim. P. 33, the trial judge sits as a "thirteenth juror," *see,e.g., United States v. Munoz*, 605 F.3d 359, 373 n.9 (6th Cir. 2010), it has also been cautioned that: "[t]he power to grant a new trial on this ground should be invoked only in exceptional cases, where the evidence weighs heavily against the verdict." 3 *Wright & Miller* § 582; *see also U.S. v. Crittenden*, 46 F.4th 292, 297 (5th Cir. 2022).  In light of the above discussion, this Court does not find that the evidence weighs heavily against the verdict.

B. Prosecutorial Misconduct

Defendant claims that the Government committed prosecutorial misconduct by presenting

half-truths to mislead the jury based on information it knew, or had strong reason to know, was false. Defendant's argument centers around two issues: (1) an unadmitted conversation Defendant had with McCord to come get a signed property release form that could help establish Defendant thought she had a legal right to McCord's property, and (2) unadmitted conversations regarding Defendant's relationship with Gonzalez showing he was lying about his romantic relationship with Deshannon to get her to help him that left the sole inference that Defendant was helping Gonzalez for no reason other than agreeing to facilitate the Lerma Cell. *See* Reply at 10-13. The Government responds that Defendant's claims are legally and factually baseless as the record did reflect evidence of Defendant's call with McCord. *See* Opp. at 18-22.

The Court would agree with the Government. Defendant has not presented evidence of prosecutorial misconduct that prejudiced Defendant in a manner that requires a new trial. Defendant's claim that she was prejudiced by the Government presenting a "half-truth" by not admitting into evidence a call where McCord told Deshannon to come pick up a property release form is not supported by the record. Through cross-examination of Special Agent Joseph Talamantez, Defendant was able to establish multiple times that such a call existed between McCord and Deshannon. Defense counsel first asked Agent Talamantez whether "Mr. McCord invited – told [Deshannon] to come to the jail to get such a [property release] form." (7/19/2023 RT excerpt of Joseph Talamantez at 101:4-23), Docket No. 1085. Agent Talamantez confirmed the existence of such a call by stating "I believe there was a conversation about it." *Id*. Defense counsel clarified that it was in a phone call, and Agent Talamantez said, "Previous to July 14th, yes." *Id*. Counsel then repeated the question a different way, asking, "You said that was a phone call that occurred prior to July the 14th of 2013, correct?" *Id*. Agent Talamantez again replied, "There was a phone call that discusses what you stated, yes." *Id*. To avoid any doubt, counsel then asked Agent Talamantez a third time about the proverbial phone call between McCord and Defendant, saying, "As a result of your knowledge of the investigation, you are aware that sometime prior to July 14th, there was a phone call in which Mr. McCord told Ms. Deshannon to come to the jail and he would give her a property release form, correct?" *Id.* at 103:14-24. The Court overruled an objection by the Government and allowed Agent Talamantez to respond, "There is a call to that effect. I don't remember the exact specifics of it, but there is a call to that effect." *Id*. During the cross-examination, defense counsel even showed Agent Talamantez a transcript of the call to refresh his memory and establish that the call took place on July 13, 2013.

*See id.* at 106:5-10.  While in the middle of using that document to refresh Agent Talamantez's memory as to the conversation between Mr. McCord and Deshannon, defense counsel chose to move on to another exhibit given the late hour.  *See id.* at 107:2-5.  Thus, Defendant was able to establish in the record that a phone call occurred between Mr. McCord and Deshannon where he told her to come to the jail to pick up a property release form, though such a form was ultimately never obtained.

Moreover, Defendant's accusations of prosecutorial misconduct in the form of half-truths are unavailing in light of the Government's statements during closing arguments.  During its closing, the Government did not try and mislead the jury with information it knew was false, or had a strong reason to doubt its existence.  Rather, the Government appeared to acknowledge the existence of the July 13 phone call between McCord and Defendant to pick up a property release form, but used the fact that she never obtained it to infer, in good faith, that none of the parties "ever believed there was actually going to be a property release form."  (7/21/2023 RT at 686:9-21).  The Government went even further and asked the jury to consider the exact inference Defendant calls for here, that Defendant did actually believe she was legally getting McCord's Mercedes.  *See id.* at 686:22-687:17.  The Government argued that even operating under that inference, Defendant's personal assistance in coordinating an armed robbery did not match such a belief and was unjustified.  *See id.*  The record shows Defendant was able to introduce evidence of the McCord call regarding the property release form into the record for the jury to consider, and that the Government did not try to mislead the jury as to the contents of that call, but embraced it head on during its closing arguments.  This Court would not consider this prosecutorial misconduct that is flagrant or unfair or prejudicial to the Defendant.

In Defendant's second argument regarding prosecutorial misconduct, Defendant appears to be arguing that there was unadmitted evidence, which the Government was aware of, that shows that Gonzalez was lying to Defendant about their romantic relationship.  *See* Reply at 7-10.  Defendant claims that not establishing Gonzalez's deception left the misleading inference that "Deshannon was doing what she was doing for no reason other than 'knowingly agree[ing] to facilitate a scheme which includes the operation or management of a RICO enterprise.'"  *Reply* at 10 (internal citation omitted).  It is unclear what half-truth or prejudice Defendant is attempting to argue.  Defendant herself admits that she and Gonzalez had a romantic relationship – three times referring to Gonzalez as Defendant's "then-boyfriend."  *See* Mot. at 6, 10, 22.  Defendant attempts

10

to make significance of Gonzalez exaggerating the extent of his romantic relationship with Deshannon (*e.g.*, wanting to get married) in order to manipulate Deshannon into doing business for him. It appears that Defendant seeks to argue that the jury was mislead by not being able to infer an alternate explanation for Defendant agreeing to help Gonzalez – *i.e.*, their romantic relationship (as built up and exaggerated as Gonzalez made it out to be).

Defendant's argument is unconvincing. First, Deputy Self testified at trial that secretaries in the Mexican Mafia typically hold a dual role where they usually have a relationship with the shot caller, often romantic, as the role requires an individual to have a personal connection and be trusted and loyal. *See* (7/20/23 RT 534:5-535:6). The jury was thus aware that secretaries may have various reasons for choosing their role, and are often times chosen specifically because they love the shot caller and are loyal to them out of romantic interest. This dual-role relationship is how Defendant was presented to the jury where both the Government and Defendant referenced Gonzalez as Defendant's boyfriend in closing arguments. *See* (7/21/23 RT 675:6-11, 725:6-11). Such a presentation allowed the jury to consider the type of inference that Defendant appears to now be arguing for – that Defendant agreed to help out Gonzalez for romantic reasons, and not out of a knowing agreement to facilitate the Lerma Cell. However, as Deputy Self explained, the two reasons are not mutually exclusive. Further, the evidence Defendant wanted to enter, to clear up the purported "half-truth," does not establish Deshannon knew of Gonzalez's deceit. Thus, even if Defendant was permitted to have entered the conversations between Gonzalez and Castaneda, that would not have changed Deshannon's knowledge of what Gonzalez was telling her. That Defendant may have been agreeing to perform acts for Gonzalez in part because of Gonzalez's romantic gaslighting is not dispositive. Thus, Defendant has not shown misconduct on the part of the prosecution, much less flagrant misconduct, resulting in prejudice to Deshannon.

In sum, Defendant has not established prosecutorial misconduct in this case regarding the unadmitted call from McCord to Defendant relating to a property release form, or unadmitted calls relating to Gonzalez exaggerating the extent of his romantic relationship with Defendant. Even if the Government's conduct could be viewed as questionable at best, Defendant has not made the required showing of prejudice. Thus, the Court would **DENY** Defendant's motion to dismiss the indictment or order a new trial.

## IV. Conclusion

Based on the foregoing discussion, the Court would **DENY** Defendant's motion for

judgment of acquittal on all counts or, in the alternative, dismissal of the indictment or a new trial.